Taft, J.
The questions to be determined on this appeal.are (1) whether the city has legal title to the east 22 feet of the property which it agreed to convey to plaintiff and (2), if so, whether the city has power to sell that part of that real estate.
A casual reading of the provisions of Sections 6 and 8 of the Act of 1831 might indicate some inconsistency between them. For example, section 6 vested the fee “in the city or town corporate” whereas section 8 vested that fee “in the county in which the town is situated.” However, a reading of the act as a whole in an effort to find some reason for these apparent differences between section 6 and section 8 leads to the conclusion that two kinds of maps were dealt with. Section 6 dealt only with plats or maps of a “city or town corporate” or a subdivision thereof and section 8 dealt with plats or maps of towns which were not incorporated.
Until 1852, all municipal corporations in this state were organized under special acts of incorporation. State, ex rel. Fosdick, v. Mayor, Recorder and Trustees of Perrysburg, 14 Ohio St., 472, 484. In 1805, there was no substantial problem with respect to “proprietors of lots or grounds in any city or town corporate.” When the General Assembly used the word “town” in the Act of-1805, it used it in its popular sense as indicating a collection of population. See Peck v. Weddell, 17 Ohio St., 271, 283, 285. The town dealt with in the Act of 1805 was not a legal entity in which the title to public ground could be vested. Ap *334 parently, for this reason, the General Assembly provided in Section 2 of the Act of 1805 for the vesting of any such title “in the county in which such town lies.” However, the words of Section 3 of the Act of 1805 make it apparent that such public grounds were to be held by the county “for the use of such town.” See Town of Lebanon v. Commrs. of Warren County, 9 Ohio, 80, 34 Am. Dec., 422. In 1831, when incorporations of cities and towns had made it possible in many instances to transfer title to the town as a corporate entity, the General Assembly by Section 6 of the Act of 1831 apparently intended to provide for the transfer to an incorporated town of the legal title to public grounds, which had formerly been vested in the county for the benefit of such a town.
It is significant that in Section 6 of the Act of 1831 the words “who have subdivided or laid out, or who shall hereafter subdivide or lay out ’ ’ were used. Prom a reading of that section 6 and of the prior Act of 1805 it is apparent that a compliance with that prior act would amount to compliance with that section 6. Since that prior act was repealed by the Act of 1831, the provisions of section 6 for vesting the fee “of land * * * intended to be for streets, alleys, ways, commons or other public uses, in such city or town corporate ’ ’ would appear on their face to replace the provisions of Section 2 of the Act of 1805 with respect to the vesting of the fee of such lands where the map or plat recorded under the prior act dealt with “lots or grounds in any city or town corporate.”
This raises the question whether, by the Act of 1831, the General Assembly could, in effect, transfer the fee of such lands, which had, under the Act of 1805, been vested “in the county in which such town lies,” to the “city or town corporate” so as to vest the fee in such city or town corporate.
The answer to this question involves a consideration *335 of just what a county is. In Cincinnati, Wilmington & Zanesville Rd. Co. v. Commrs. of Clinton County, 1 Ohio St., 77, on page 89, it is said in the court’s opinion by' Ranney, J.:
“* * # what is a county? * * * Rightly considered, it is a mere instrumentality, a means in the hands of the legislative power to accomplish its lawful purposes; and to this extent, a creature in the hands of its creator, subject to be moulded and fashioned as the ever varying exigencies of the state may require. It would seem to follow, that it may, from time to time, be clothed with such powers, and charged with such duties, of a local administrative character, not vested elsewhere by the Constitution, as the General Assembly may see fit to direct. And so they have always been treated and used. Scarcely a year of our legislative history has passed which has not added to and taken from them powers and duties of this character. The Legislature might perform their duties directly, but for the most obvious reasons, could not as understandingly and efficiently do it, as by the employment of those subordinate agencies.”
In State, ex rel. Godfrey, a Taxpayer, v. O’Brien, Treas., 95 Ohio St., 166, 115 N. E., 25, paragraph one of the syllabus reads:
“County and township subdivisions are agencies of the state, and constituent parts of the plan of permanent organization of state government.”
See also Board of Commrs. of Hamilton County v. Mighels, 7 Ohio St., 110, 119.
When title to the public grounds described on the Montgomery plat of Uniontown was vested by Section 2 of the Act of 1805 in the county of Richland, that county held that title merely as agent for the state. Its principal, the state, acting through the General Assembly, had at all times full power to provide for the transfer of that title from the county to the state. *336 It likewise had full power to provide for the transfer of that title to the municipal corporation in which such lands were located.
In our opinion, therefore, the General Assembly may provide for the transfer to and vesting in a municipal corporation of the fee to lands in such municipal corporation which were theretofore vested by prior laws and by dedications thereunder in the county in which such municipal corporation was located.
In City of Zanesville v. Zanesville Canal & Mfg. Co., Trustee, 159 Ohio St., 203, 111 N. E. (2d), 922, this court had presented to it somewhat similar questions as to whether, by the Act of 1831, title to platted public grounds passed from a county to the municipal corporation in which such grounds were located. In that case this court refused to pass upon the question because no one was before the court representing the interests of the county. In the instant case, the Attorney. General filed a motion in the Common Pleas Court for an order making him a party defendant. That motion was granted and the Attorney General then filed an answer praying “that the court determine the question of title and the right to convey.”
Assuming that there might be some question as to whether the Attorney General could have been compelled to come in and represent the interests of the state in this action, it is apparent that the Attorney General might have brought an action on behalf of the state to protect those interests. See Section 340, General Code. Furthermore, he is authorized by statute to represent the state where its interests are involved in a civil proceeding. Section 333, General Code. By the prayer to his answer, he has, in effect, joined in at least the portion of this action seeking a declaratory judgment. We have, therefore, a different situation from that involved in the Zanesville case. When the county held title, it merely held it as *337 agent for the state. In the present action, the presence of its principal, the state, through its Attorney General, should satisfy the requirement of the Zanesville case that someone be in court to protect the interests of the county. Certainly, the interests of the county as agent for the state could rise no higher than the interests of the state as its principal.
' This brings us to the question whether the city of Ashland, as holder of the legal title to the land denominated “public ground” on the Montgomery plat of Uniontown, has the power to convey that title.
Ordinarily, a city has the power to convey property held by it for municipal purposes and no longer needed for such purposes. Such power is included within the powers of local self-government conferred by Article XVIII of the Constitution. Hugger v. City of Ironton, 148 Ohio St., 670, 76 N. E. (2d), 397, dismissing as involving no debatable constitutional question an appeal from a decision (83 Ohio App., 21, 82 N. E. [2d], 118) so holding. The General Assembly has also specifically granted such power to municipalities by Section 3698, General Code.
In contending that the city has no power to sell this land, denominated “public ground” on the foregoing plat, the Attorney General relies upon the provisions of Section 2 of the Act of 1805, Section 8 of the Act of 1831, and, to a lesser extent, on section 6 of the latter act. For the reasons hereinbefore given, we are of the opinion that Section 8 of the Act of 1831 is not applicable to the problems involved in the instant case.
The words “public ground” may be interpreted to mean either ground belonging to the public or ground to be used by the public. If the former interpretation is given, then clearly the public can sell it. If only the latter interpretation is given, then it is arguable that the public can only use the ground — the public cannot sell it because that would prevent its use by the *338 public. Thus it was stated in Board of Education of Van Wert v. Inhabitants, 18 Ohio St., 221, 226, 98 Am. Dec., 114:
“The dedication in this case, as stated in the petition was ‘for school purposes, and on which to erect schoolhouses.’ Without determining whether, under this dedication, the lots could properly be used for school purposes, other than the erection of schoolhouses thereon, it is enough to say that the dedication is of the land, and not of its value or proceeds. It confers no power of alienation discharged of the use by which the purpose of the dedication might be utterly defeated.”
But see LeClercq et al., Inhabitants of Gallipolis, v. Trustees of Gallipolis, 7 Ohio, 217, 220; Widow and Heirs of Reynolds v. Commrs. of Stark County, 5 Ohio, 204.
By the Act of 1805, the record of the plat or map was to be “deemed a sufficient conveyance to vest the fee * # * in the county” and, by Section 6 of the Act of 1831, in the “city or town corporate.”
Ordinarily, where a conveyance vests the fee of a parcel of real estate in a party it vests in that party the whole interest in that parcel including the inherent element of alienability. Anderson v. Cary, 36 Ohio St., 506, 38 Am. Rep., 602.
In the opinion in the recent case of McMechan v. Board of Education of Richland Twp., 157 Ohio St., 241, 105 N. E. (2d), 270, a distinction is made between cases where the, statute authorizes a taking of only the use of lands for a specific public use and where such statute authorizes a taking of the fee for such specific public use. With respect to the latter type of statute, the opinion refers to Malone v. City of Toledo, 34 Ohio St., 541, and Haynes v. Jones, 91 Ohio St., 197, 110 N. E., 469. In the latter case, this court held that, under the applicable statute, the state acquired the *339 fee simple title of all lands appropriated for canal purposes, and that, although the use of such lands for canal purposes had ended and the state had leased some of that land for other purposes, the state’s lessee could recover possession of such land in an action of ejectment. See also Henry v. Columbus Depot Co., 135 Ohio St., 311, 317, 318, 20 N. E. (2d), 921, where the same distinction is made and discussed.
Thus, the rule seems to be that, where a valid statute authorizes the appropriation of the fee of land for a specific public use or purpose instead of the taking of the mere use of land for such use or purpose, the appropriating authority may be authorized to sell the land taken when it determines that it is no longer needed for that use or purpose. Brooklyn Park Comm. v. Armstrong, 45 N. Y., 234, 6 Am. Rep., 70. This rule appears to be inconsistent with any idea that, where the fee of land is conveyed for a valuable consideration to a municipal corporation in trust for the public use of its inhabitants, such municipal corporation cannot sell such land when it determines that it is no longer needed for such use.
In those cases where no conveyance of the fee to a public entity is involved, the dedication for public uses is analogous to a mere taking by eminent domain for public uses where the fee is not taken. Louisville & Nashville Rd. Co. v. City of Cincinnati, 76 Ohio St., 481, 81 N. E., 983, and Lessee of City of Cincinnati v. Commrs. of Hamilton County, 7 Ohio, 88, are apparently such cases. See also LeClercq v. Trustees of Gallipolis, supra, and Langley v. Mayor and Trustees of Gallipolis, 2 Ohio St., 107.
Probably the strongest line of cases, sustaining the power of the city to sell the land involved in the instant case, are those relating to the vacation of city streets.
Since the enactment of Section 6 of the Act of 1831, *340 the statutory provisions relative to the dedication of streets in municipal corporations on the recording of a plat have been substantially as set forth in that section. See Sections 3584 and 3585, G-eneral Code. This court has held that there is no reverter to the dedicator or those claiming under him when such streets are vacated, but that the land occupied by the vacated portion of the street passes to the owners of land adjacent to and abutting thereon because of their private rights therein, as for access, ingress and egress. Stevens v. Shannon, 6 C. C., 142, 3 C. D., 386, which was followed and approved as an authority in Stephens v. Taylor, Exr., 51 Ohio St., 593, and in Kerr v. Commrs., 51 Ohio St., 593. See also Hamilton, Glendale & Cincinnati Traction Co. v. Parish, 67 Ohio St., 181, 190, 65 N. E., 1011, 60 L. R. A., 531, and Callen v. Columbus Edison Electric Light Co., 66 Ohio St., 166, 174, 64 N. E., 141.
Where the municipal corporation, by vacating a street, abandons the land occupied by the street to the adjacent property owners, only those who have no remaining reasonable access to their property are recognized as having any legally enforcible rights. Thus in New York, Chicago & St. Louis Rd. Co. v. Bucsi, 128 Ohio St., 134, 190 N. E., 562, 93 A. L. R., 632, the syllabus reads:
“1. Where a duly dedicated and accepted east-and-west street of a city is vacated by the city some distance from its eastern terminus and completely closed to travel, the owner of property abutting upon such street, but not upon the vacated portion thereof, has no right of action for damages because of such vacation, so long as his access to the city street system to the west is not impaired.
‘ ‘ 2. Under such circumstances, the abutting property owner’s damage, if any, differs in degree but not in kind from that of the general public, and his legal *341 status falls within the category of damnum absque injuria. ’ ’
Likewise, it is stated in the opinion in Kinnear Mfg. Co. v. Beatty, 65 Ohio St., 264, 285, 62 N. E., 341, 87 Am. St. Rep., 600:
“We see no good reason for holding, as seems to be contended, that the rule is different as to the streets and alleys of an addition to the plat of a city; that in such case there is an implied covenant that the streets and alleys, indicated on the plat, are to remain open for public use, and that each owner of a lot in the addition may insist on this covenant.”
See also City of Bellevue, ex rel. Vickery, City Solr., v. Stedman, 138 Ohio St., 281, 34 N. E. (2d), 769.
It may be observed that these conclusions are consistent with the reasoning and decision in the early case of Smith v. Heuston, 6 Ohio, 101, 25 Am. Dec., 741.
Thus, a vacation of a street is equivalent to a transfer of land specifically dedicated for the street to the parties whose properties are adjacent to such land. Traction Co. v. Parish, supra, 191. If the general public, though damaged by such street vacation, has no legally enforcible rights, how can it be said that a municipal corporation must continue to use for streets such land dedicated for street use? Under Stevens v. Shannon, supra, the dedicator and those claiming under him have no enforcible remedy. Under New Tork, Chicago & St. Louis Rd. Co. v. Bucsi, supra, the public has no enforcible remedy; and only those who no longer have any reasonable access to their property can complain. In other words, only private rights to pass over the vacated' portion of a street, as the only reasonable means of access to property, are protected.
However, in Board of Education of Van Wert v. Inhabitants, supra, the syllabus reads:
*342 “The incorporated village of Van Wert was laid ont in 1835, and the proprietors, by plat duly acknowledged and recorded, dedicated two specified lots therein ‘for school purposes, and on which to erect schoolhouses. ’ By reason of the subsequent construction and continued operation of a railroad, and the location of a depot in connection therewith, in close proximity to these lots, they were rendered unsuitable to be used as sites for schoolhouses, and their use for that purpose became dangerous. A petition was filed by the board of education of the incorporated village, praying, for the reason aforesaid, that the Court of Common Pleas might order the lots to be sold, and the proceeds of sale to be applied to the purchase of suitable schoolhouse sites, or to the erection of schoolhouses on suitable grounds to be procured by the board. Upon demurrer to the petition, held:
“1. That the dedication was for a specific use, and conferred no power of alienation so as to extinguish the use.
“2. That if the use created by the dedication were abandoned, or should become impossible of execution, the premises would revert to the dedicators or their representatives, and that, without their consent, they could not be divested of their contingent right of reversion by an absolute alienation.
“3. The principle upon which a trust may, under certain circumstances, be executed cy pres is not applicable to such a case.”
If the foregoing syllabus is read without a realization that the Act of 1831, under which the plat was recorded, provided for conveyance by the proprietors of the fee to the land dedicated, then the conclusions stated are consistent with the recent decision in McMechan v. Board of Education, supra. They are treated in the opinion in the latter case as involving a dedication of the land “for school purposes,” etc., *343 rather than a conveyance of the fee for such purposes. However, a reading of the opinion in the Van Wert case discloses that the dedication was made under the Act of 1831 which involved a conveyance of the fee.
In the opinion in the Van Wert case, after referring to a statute giving “a single school district” authority to sell if the sale had been voted for at a regular meeting of the electors of the district, the court said at page 225:
“It does not appear that the village of Yan Wert is organized into a single school district under the acts referred to, nor does the petition state that a sale has been voted for at a regular meeting of the electors of such district.”
This statement indicates that the plaintiff’s petition was demurrable. As the report of the case indicates that it was before the court on demurrer, it appears that it was not necessary for the court to make those pronouncements in the opinion, relied upon by the Attorney General, in order to support the judgment which it rendered in sustaining the demurrer to the petition.
Nevertheless, there are pronouncements in the syllabus and opinion in the Van Wert case which, when read in the light of the facts of that case and the applicable statutes, support the contention of the Attorney General that, if the “public ground” involved in the instant case ceases to be used by or for the public, there will be a reverter thereof to those who dedicated it as public ground or those claiming under them. Those pronouncements appear to be inconsistent with the decisions and syllabi in the later cases of In Matter of Copps Methodist Episcopal Church, 120 Ohio St., 309, 166 N. E., 218, and Miller v. Village of Brookville, 152 Ohio St., 217, 89 N. E. (2d), 85. See also Village of Ashland v. Greiner, 58 Ohio St., 67, 50 N. E., 99.
In Miller v. Brookville, supra, the syllabus reads:
*344 “When a conveyance of land owned in fee simple is made to and accepted by a municipality in perpetuity for use as a park, and there is no provision for forfeiture or reversion, the entire estate of the grantor is divested, and the title of the municipality thereto is not a determinable fee but a fee simple.”
Likewise, in In Matter of Copps Methodist Episcopal Church, supra, the syllabus reads:
“Where a quitclaim deed, for a valuable consideration, conveys to trustees of an unincorporated church association certain real property, ‘to have and to hold * * * unto the said grantees and their successors * * * so long as said lot is held and used for church purposes,’ without any provision for forfeiture or reversion, such statement is not a condition or limitation of the grant. Since the deed contains no provision for reversion or forfeiture, all of the estate of the grantor was conveyed to the grantees. Hence, a church building affixed to the realty does not pass to the heirs of the grantors when such lot and building cease to be used for church purposes.”
The Attorney General argues that these later cases involved conveyances for a consideration, and that there was no consideration for the conveyance of the “public ground” in the instant case. However, as indicated in the opinions in Stevens v. Shannon, supra., and Traction Co. v. Parish, supra, 191, the dedicator did receive a consideration for his conveyance of such “public ground.” Thus, the dedicator presumably received more for the lots sold because their value was enhanced by the benefits to the public resulting from the value to the public of the land conveyed to it as “public ground.” Furthermore, without complying with the provisions of the Act of 1805, the dedicator would have had no right to sell any lots and would have been subject to the penalties of that act if he did sell them. Thus, the right to sell which he acquired *345 and the penalties which he avoided, by conveying the public ground in fee, would certainly represent a valuable consideration for that conveyance.
The decisions in Miller v. Brookfield, supra, In Matter of Copps Church, supra, Stevens v. Shannon, supra, Kerr v. Commrs., supra, and Stevens v. Taylor, supra, cannot be reconciled with the portion of the syllabus in the paragraph numbered two of the Van Wert case. Likewise, that portion of that syllabus appears to be inconsistent with the reasoning in the opinions in McMechan v. Board of Education, supra, and Henry v. Columbus Depot Co., supra, and with the decision in Haynes v. Jones, supra. That portion of the syllabus of the Van Wert case must therefore be overruled so far as it relates to an instance where, under the Act of 1831, the fee has been conveyed by the dedicators.
Although those claiming under the proprietors of lands dedicated for public uses pursuant to the Act of 1805 have no rights on the abandonment of such uses and purposes, the problem still remains whether anyone else has a right to prevent the sale of such lands. See Callen v. Electric Light Co., supra, 173. The Act of 1805 did provide that land dedicated thereunder was to be held by the holder of the legal title “in trust to and for the uses and purposes * # * named, expressed or intended, and for no other use or purpose whatever.” On this problem, the syllabus in the Van Wert case and especially subparagraphs one and three thereof indicate that the public, as beneficiaries of such trust, can compel use of the land by or for the public, and can prevent any disposition of the land which would extinguish or interfere with such use. See also L. & N. Rd. Co. v. Cincinnati, supra.
Is the legislative power of the city of Ashland sufficient to support the proposed sale by the city of the fee to the land — a sale which will necessarily take from *346 the inhabitants of Ashland their rights to require the use of that land for or by them1? In the Van Wert case, this court held that the mere power to sell, which had in that case been given to the board of education by the General Assembly, was not sufficient. Whether the General Assembly had a sufficient legislative power was not involved and was neither argued nor considered in that case.
A consideration of the extent of the legislative power now vested in the city of Ashland by Section 3, Article XVIII of the Constitution, granting “authority to exercise all powers of local self-government” makes it apparent that the city does have the power to sell the “public ground” involved in the instant case, even though such sale will involve the extinguishment of public rights of its inhabitants therein.
For example, this court has held that even the power of eminent domain is included within the powers of government conferred by those constitutional provisions. State, ex rel. Bruestle, City Solicitor, v. Rich, Mayor, 159 Ohio St., 13, 110 N. E. (2d), 778.
It was suggested in L. & N. Rd. Co. v. Cincinnati, supra, 507, that a legislature might, in the exercise of the power of eminent domain, authorize property dedicated to a specific use to be taken for a different public use. A sequel to that case held that a legislature could. City of Cincinnati v. Louisville & Nashville Rd. Co., 223 U. S., 390, 56 L. Ed., 481, 32 S. Ct., 267 (affirming 82 Ohio St., 466, 92 N. E., 1111). See also Clark v. City of Providence, 16 R. I., 337, 15 A., 763, 1 L. R. A., 725; United States v. Carmack, 329 U. S., 230, 91 L. Ed., 209, 67 S. Ct., 252; Codman v. Crocker, 203 Mass., 146, 89 N. E., 177; City of Tyler v. Smith County (Tex.), 246 S. W. (2d), 601; Kramer v. City of Lakeland (Fla.), 38 S. (2d), 126, 131; Carson v. State, 240 Iowa, 1178, 38 N. W. (2d), 168; 11 McQuillan, Municipal Corporations (3 Ed.), 782, Section 33.76.
*347 The power of eminent domain, when not limited by constitutional or statutory provisions, is the power, inherent in every sovereign state, to take and dispose of any or all property within the state. United States v. Jones, Admr., 109 U. S., 513, 27 L. Ed., 1015, 1017, 3 S. Ct., 346, City of Cincinnati v. L. & N. Rd. Co., supra, 485.
In 18 American Jurisprudence, 637, Section 8, it is said:
“ * * * It is now generally considered that the power of eminent domain is not a property right or an exercise by the state of an ultimate ownership in the soil, but that it is based on the sovereignty of the state. Since that sovereignty includes the right to enact and enforce as law anything not physically impossible and not forbidden by some clause in the Constitution and the taking of property within the jurisdiction of the state for public use on payment of compensation is neither impossible nor prohibited by the Constitution, a statute authorizing the exercise of eminent domain needs no further justification.” (Italics supplied.)
It may be observed that the requirement that the taking be “on payment of compensation” is one generally imposed by constitutional limitations where private property is involved. It is imposed in this state by Section 19 of Article I of the Constitution. However, that constitutional limitation is by its words applicable only to private property. Of course, if property is disposed of by a city for an inadequate price, such disposition may involve a taking of private property, because it will necessitate the imposition of taxes to replace the value not received for the property so disposed of. However, there is no claim that the price to be received for the land involved in the instant case is not an adequate price. Furthermore, unlike in Daniel v. City of Columbus, 8 C. C., 642, 4 C. D., 293 (affirmed *348 without opinion, 53 Ohio St., 658, 44 N. E., 1150), the same segment of the public whose public rights in the land are to be taken will receive an adequate consideration for those rights. The money received on the sale of the land will be used for their benefit. It can only be expended for a public purpose of interest and advantage to the inhabitants of Ashland. State, ex rel. McClure, City Mgr., v. Hagerman, Dir., 155 Ohio St., 320, 98 N. E. (2d), 835. In the Daniel case, there was no provision for payment to or for the benefit of the segment of the public from which public rights were to be taken. Here, that segment will receive for its benefit the full value of the rights taken from it. There will be no necessity of taxation to replace that value. Hence, no indirect taking of private property will be involved.
As to the requirement that a taking be for a public use or purpose, it is arguable that, where a taking of public rights results from a sale and the sale is for an adequate price, such taking will always be for a public use or purpose, because the proceeds of the sale can be expended only for a public purpose. On the other hand, it is arguable that a sale of property, which will necessarily destroy public rights to the use of such property by or for the public, may in some instances be against the public interest, so that the taking of such public rights could not be considered a taking for a public use or purpose. However, with respect to that requirement in the instant case, it is only necessary to determine that the legislative body of the city did not clearly abuse its discretion in determining that the city did not need “for any municipal purpose” that portion of the- “public ground” which it proposes to sell. State, ex rel. McClure, v. Hagerman, supra. If it did not, then the taking of public rights to the use of such property by or for the public, which' would necessarily be involved in the *349 sale of that portion of the “public ground,” would be a taking for a public purpose. It is clear that there was no such abuse of discretion.
As hereinbefore pointed out, by reason of their conveyance of the fee for a valuable consideration, the proprietors of Uniontown and those claiming under them have no interest or rights in this public ground, except as members of the public. No rights of abutting landowners are involved. Cf. Callen v. Electric Light Co., supra. The portion of the “public ground” to be sold is bounded on all sides either by city streets or by other city-owned land. The rights of those who own other land which was included in the plat of Uniontown can rise no higher than the rights of the general public. N. Y., St. Louis & Chicago Rd. Co. v. Bucsi, supra; Kinnear Mfg. Co. v. Beatty, supra; City of Bellevue, ex rel. Vickery, City Solr., v. Stedman, supra. Therefore, the usual constitutional limitations on the taking of private property are not involved. Cf. Reichelderfer v. Quinn, 287 U. S., 315, 320, 77 L. Ed., 331, 53 S. Ct., 177, 83 A. L. R., 1429; East Chicago Co. v. City of East Chicago, 171 Ind., 654, 87 N. E., 17, 20; Zanesville v. Telegraph & Telephone Co., 64 Ohio St., 67, 81, 59 N. E., 781; Chagrin Falls & Cleveland Plank Rd. Co. v. Crane, 2 Ohio St., 419, 426. Furthermore, the taking here, unlike in Daniel v. City of Columbus, supra, is not a taking without any consideration of public rights of inhabitants of the city for a public purpose of interest and advantage to a much larger segment of the public; but it is a taking of those rights for a public purpose of interest and advantage to the same segment of the public represented by those inhabitants of the city.
It is arguable that, even where only the taking of public rights is involved, the legislative power to take them may be limited by those constitutional provisions providing against the impairment of the obligation of *350 contract. However, the legislative power of eminent domain is not one which can be bargained away (18 American Jurisprudence, 636, Section 7) and, if the law, as it existed at the time that this dedication was made by recording the plat of Uniontown pursuant to the provisions of the Act of 1805, is read into any contract which may be involved in such a dedication, then the exercise of the legislative power of eminent domain by the city of Ashland to take any rights, provided for by such contract of dedication, is not prevented by those constitutional provisions. Cincinnati v. L. & N. Rd. Co., supra. Although that power was vested in the General Assembly at the time of the dedication and is now partly vested in the city, it is no greater or less than it was at the time of the dedication. It is the same power.
Therefore, our conclusion is that the powers of local self-government, vested in Ashland by Section 3 of Article XVIII of the Ohio Constitution, include the legislative power to dispose of the public rights of that portion of the public represented by the inhabitants of Ashland in land located in Ashland where such rights are disposed of for a public purpose of interest and advantage to those inhabitants of Ashland. See Langenau Mfg. Co. v. City of Cleveland, 159 Ohio St., 525, 112 N. E. (2d), 658. In the instant case, there are no constitutional limitations which would prevent or limit such an exercise of that power. Neither does the Constitution give the General Assembly any authority to prevent or limit such an exercise of that power. State, ex rel. Bruestle, City Solr., v. Rich, Mayor, 159 Ohio St., 13, 32, 110 N. E. (2d), 778. Also, the evidence does not disclose any provision of the charter of the city of Ashland which would prevent or limit such an exercise of that power.
This does, not mean that the city must in this particular instance institute any condemnation or other *351 eminent domain proceeding for the purpose of acquiring such public rights in such land. The sale of that land, provided for in the ordinance authorizing its sale, will, if carried out in accordance with the terms of that ordinance, necessarily involve a taking of such public rights. If the city did not have “authority to exercise all powers of local self-government, ’ ’ there might be some question as to the validity of an ordinance having that effect, as there was with regard to the legislative action of the school board in the Van Wert case. However, that authority of the eity, including as it does even the power of eminent domain, removes any such question, because it furnishes a sound basis for the action of its legislative body in authorizing the sale.
In other words, the mere fact that the city has the fee to the “public ground” may not be sufficient to justify the disposition of that fee pursuant to any mere power of sale vested in the city. This is because such disposition may, and in the instant case will, necessarily involve the destruction and extinguishment of public rights of the inhabitants of the city to require the use of the land by or for that part of the public represented by such inhabitants. See Callen v. Electric Light Co., supra. Any ordinance providing for the disposition of such fee must, therefore, necessarily be supported by a legislative power of the city sufficient to authorize the eity to destroy and extinguish such public rights. If, as in the case of the taking of private rights or property, constitutional limitations required compensation for property or rights so taken and extinguished, then any ordinance necessarily involving such taking would, in order not to conflict with such constitutional provisions, have to provide the owner of the property or of the rights taken with some means of securing such compensation. As hereinbefore pointed out, no such problem is involved where the rights *352 taken are merely public rights of the inhabitants of the city as distinguished from private rights; and where the talcing of those public rights is wholly for the benefit of the same segment of the public from which they are taken. Cf. Daniel v. City of Columbus, supra,. In view of the ordinance provisions clearly designating the property being sold, there is no occasion for any other legal proceeding to designate specifically the property with respect to which rights are being taken.
The Attorney General has referred to certain other cases as sustaining his contentions.
In Gleason v. Cleveland, 49 Ohio St., 431, 31 N. E., 802, it was held that the General Assembly could, without the consent of the city in which a dedicated public square was located, authorize a specific use of that public square. That case was decided before all powers of local self-government were delegated by the people to municipal corporations. At the time of the decision, the General Assembly had full legislative authority to confer powers upon municipal corporations or withdraw powers from them. See 28 Ohio Jurisprudence, 84, 85, Section 57. In effect, the General Assembly, by the legislation involved in the Gleason case, merely withdrew from the city some of the powers which the city had had over the public square. No such legislation, assuming that it would now be valid, is involved in the instant case.
In State, ex rel. Crabbe, Atty. Genl., v. Sandusky, Mansfield & Newark Rd. Co., 111 Ohio St., 512, 146 N. E., 58, a plat had been filed in 1818 for the city of Sandusky upon which appeared parcels of ground designated as “open and public slips to the water from Water street * * * so to remain forever.” It was held that the city had the power to authorize the construction and maintenance of railroad tracks across these “slips,” so long as the “slips” remained open for the *353 free and uninterrupted use of the public. Thus, the court in that case did permit a use of these “slips” not either “expressed, named or intended,” notwithstanding the provisions of Section 2 of the Act of 1805.
In LeClercq v. Trustees of Gallipolis, supra, two square miles were conveyed to individual trustees in fee but “in trust for the inhabitants of Gallipolis according to their several rights and interests, and agreeable to a plan adopted by the inhabitants” in 1795. Under the terms of this plan “the public place” was to “remain free and never be alienated or obstructed * * * by any kind of buildings,” lots were numbered and valued, and lots fronting on “the place” were valued higher because they were said to be “a source of wealth by their situation,” and those more remote were set at a lower price proportional to their distance therefrom. This plan had been agreed upon by vote of the prospective lot owners and signed by them individually before the conveyance of the land in fee to their trustees. The trustees executed their trust by conveying the lots to those individuals and made a plat of the town leaving “the place” open. This plat was acknowledged in 1796 and was later recorded. Under such a plan, it is apparent that those having lots abutting on “the place” acquired private rights therein. It does not appear that any effort was made to appropriate those private rights, and an injunction was given to such abutting landowners to protect those rights. In the instant case, there is no evidence of any plan or agreement which might justify the conclusion that any lot owners were to have private rights in the “public ground,” as distinguished from their rights as members of the public. Cf. Kinnear Mfg. Co. v. Beatty, supra, and Smith v. Beuston, supra.
In Brown v. Manning, 6 Ohio, 298, 27 Am. Dec., 255, the court allowed a plaintiff, as an owner of property abutting on a public square and as an inhabitant of a *354 town which apparently was not incorporated, an injunction against misuse by heirs of a dedicator of a public square which had been dedicated on a plat pursuant to the Act of 1805. Unless the case can be justified because such an abutter on a public square acquired private rights therein as an abutter on a street did in the portion of the street adjacent to his property (but see Smith v. Houston, supra, in the same volume) or because the town was not incorporated so that there was no legal entity apart from an inhabitant who could enforce the rights of the town, it is difficult to reconcile that decision with more recent cases such as New York, Chicago & St. Louis Rd. Co. v. Rucsi, supra.
Our conclusion is that plaintiff is entitled to a judgment determining that the city of Ashland has the legal title to and the power to sell the east 22 feet of the land now occupied by the opera house; and that plaintiff is also entitled to a judgment ordering the city to convey that real estate to him on compliance with all obligations provided for in the contract of sale resulting from his high bid for that property. The judgment of the Court of Appeals is, therefore, reversed and such a final judgment is rendered for the plaintiff.

Judgment reversed and final judgment for plaintiff.

Middleton, Hart, Zimmerman and Stewart, JJ., concur.
Weygandt, C. J., dissents.
Lamneck, J., not participating.